Thank you, sir. May it please the court. I'm Frank Friedman representing Azdel. Francis Casola and Aaron Ashwell are with me at council's table. This appeal raises commercial contract questions and also fundamental Rule 56 summary judgment issues because the root of our appeal is that the district court repeatedly failed to view disputed facts and inferences in best light to Azdel. I noticed that. It may be a common theme, but in this case, we think it's a very important one. The appellate issues fall into three categories. First, violation of confidentiality and non-disclosure provisions. Second, interpretation of the master agreement or MOU and how that interplays with the UCC relating to Zodiac's receipt and use of our product. And third, a discovery issue dealing with the common interest privilege, which we think the court below misapplied. Let's turn to the confidentiality issue first. The master agreement contains a confidentiality agreement at paragraph 12 that's binding on both parties. It's at JA 2191. And the parties also entered a non-disclosure agreement that's at JA 2194 that says specifications, prototypes, cost, and pricing information are confidential. So what does Zodiac do? It gives our prototype product to Crane, a competitor, to measure, test, and dissect. It clandestinely slips Crane our pricing information so they can leverage down Crane's price. And it takes the specs, the product specifications, Asdell and Zodiac crafted together and gives them to Crane. Copying them so completely that Zodiac's specs to Crane still have Asdell's name in them at JA 2420. The first thing you say is that they disclose the specification? They disclose the specification, they disclose the prototype, and they disclose pricing. Yes, sir. Seems like you need to take them sort of one at a time. Yes, sir. I'll start with the pricing because Zodiac essentially acknowledges this. They complain that we exaggerate it, but they admit that they sent, quote, historic pricing. That's at JA 2398 information to Crane. And the only historic prices were ours. And they did it in a fairly clandestine or furtive way through a third party where Crane, at JA 2389, 2397, Crane officials admit we got this pricing from Zodiac. What do you mean the only ones were yours? I mean, there are some prices that are yours, but there are some that are not your prices. At least on a historic pricing board, when I look at that in comparison with your confidential pricing letter, is that a fair comparison? Look at it, too. Sir, what I meant when I said they call it historic pricing, and the only historic prices they've ever received are from us. Now, not all of those numbers are directly from us, but the two most important ones are, and it's perhaps easiest on page 34 of our $7.28 and $5.56. $5.96, but it's hard to read. Yes, sir. Those are the two key ones. I'm looking at your sheet, and those two numbers are there, and those two numbers in the midst of all these other numbers are the ones that make this a disclosure of confidentiality? They're the ones that disclose the price. They're also the ones over here on the plus or minus section. You can do the math, you know, plus or minus 25 grams GSM. If you add or subtract that number, you get other numbers. So if you had 50... I wasn't about to know they were yours, and they were not yours. I mean... Well, the point is what they're trying to do, they're... We sent them our prices, and they slipped them to a competitor that they're actually grooming. They're basically saying they weren't in it. Crane wasn't in it. They say, here's the prototype. Here's the price. Basically, you got a beat, and let's make some sheets, because they don't... Basically, they have a problem with us, because they gave us this heavy weight. They basically admit they gave us the wrong weight in best light to us for summary judgment purposes, and they don't want to pay us $600,000. So they go to Crane and say, why don't we do business? I thought this was all... The pricing was the... Tell them what they were willing to pay. It wasn't trying to disclose your prices. Well, sir, we have both the NDA, the non-disclosure, and we've got the MOU that says, you know, purchase orders are confidential. We put the information in there, and they disclose it. But they're just telling them what they're willing to pay. Well, the argument that people have a right to do business kind of ends at the nose of what they promise not to disclose, and they'd be willing to pay what you say is what you say. Well, when they call it historic pricing, which implies this is what you have to beat, and we're the only ones that gave historic pricing, and they use the exact figures off our sheet. Yes, sir. If I want to know what somebody's going to pay, I want to know what they've been paying historically. And I don't disagree with that, except when you promise not to divulge it. They're working against us, and I'll move on, but there's no question that... It seems like you've got two numbers in there, and I'll look at it. You tell me those are the most important. Well, they're the most important ones, but if you do the plus or minus, there are more than two, because when you see the GSM, you know, that's for say 1400. You know, if you want to do 1300, you can do the math, and it works a lot with their sheet. But let me move on to the prototypes, because basically with these, our lightweight sheets, the 1320s, you know, when we bring them to the 2000s, suddenly they realize they're too heavy. They're the ones that ordered the 2000s. We come up with this 1320, and they hand those over to Crane also, along with the specs. Both are listed as confidential items in the NDA, and that's a JA-2194. Zodiac argues the prototypes aren't stamped confidential, and they're commercially available. They weren't. They weren't commercially available, and their own witness. I'm getting to that. There's a compound question, and I got to be careful. Thank you. Our own, their own employees say you would never stamp a sheet confidential. That's a JA-1600, and the purchase orders and whatnot that we sent with these were confidential. They know what they're doing here, and in best light to us, these prototypes are clearly not released to the public. Well, the MOU said that you need to stamp, you need to mark items confidential or send information within 30 days, I believe. But I think our POs for these documents were all marked for these items were confidential. You'd never stamp the product itself confidential. They've admitted that. Our paperwork says these 1320s and other things. We're sending them all kinds of samples because they ordered 2000. Suddenly, they're saying well, the paperwork says confidential for the 1320s and the, yes. That's the item. Well, we're also saying they've, I'm saying that's that's one thing, but I'm also saying that in best light to us, they've admitted that they wouldn't expect 16, JA-1600, you wouldn't expect to have the prototype stamped. It's clear that they're using our 1320s, and for flavor of that use, basically, you were talking about the pricing, and I mean, I think that's bad also, but this is much worse. Crane is given Asdell sheets to use as a testing control at JA-965-66. Asdell's air light sheets were literally shipped to Crane for use in developing its product, 969-972. Emails from Zodiac tell Crane to measure Asdell sheets to figure out a gapping problem at JA-971, 973, and 1802. There's an email where Zodiac and Crane are asking, who knows where the infamous Asdell board is so we can measure the scrim? That's at 1802, 973, 1885, and Crane admits they used our product to help. What's the best evidence that you have that says this was prototype and not commercially available? Okay. My first answer to that is that for purposes of summary judgment, there's a lot of evidence both ways, okay? At 1107, one of their witnesses says none of this was commercially available, and the reason for that is we're sending it to them sort of on the fly. They know. In fact, this particular document, 2493 and 2495 of the appendix, that's this 20 sheets that they got of the 1320. This is new, and it's marked with the woven glass scrim, which is a new development. The things say that they're samples and that they have experimental skin. Now, there is a document, and I have to admit it, there's one end that has a mistake. It says commercial on it, but the same document says experimental skin, and the same, you know, for purposes of summary judgment, we should have it in best light to us, because even the facts of the case make clear that we gave them 2000, which is exactly what they asked for, and then they say, no, you got to do it, you got to do it lower, and we're sending them tests. We're sending them samples. They're not commercial. How do we know it was 1320 and not 1350? Well, a couple of reasons, and again, a couple of JA sites, because they're important in a summary judgment case. First of all, what I just said, what they got, the 1320, with the sample skin and the woven scrim, what they used had a woven scrim, and that's the new, that's the latest, that's 2493 and 2495, but also for purposes of summary judgment, at 1850, they call 1320 1350. They're constantly, well, basically what they say is 1320 and 1350 1350 has the scrim on it. The point is, they're both experimental, and they're both not commercial, and the guy at 1107 admits that. You think there's an issue of fact? I think there's an issue of fact, is what I'm saying. Yes, sir. The court basically, the court basically said it didn't like our case because we didn't have lost profits, and for time purposes, I will jump through that analysis and just say the EJACSO case, the Eden-Hannon case, the Foster case, all say that's just not a right basis in a confidentiality claim. It's not the right basis to try to eliminate a claim for breach of confidentiality, and... Don't you think you ought to put some time on the termination for the rejection of this order? I will, I will. Let's move to the UCC cases, and again, with respect to these claims, we feel the district court, again, just glaringly took evidence in best light to Zodiac, not Asdell. The district court's fundamental Rule 56 error was the conclusion that Asdell's error light failed to meet required specs. Now, the problem with that is, is that at page 2078, they admitted it was a jury question as to the specs. Okay, we gave them, and we said we gave them, what they asked for. The problem was that they then found out when they took it, they got it, they put it through Quality. Quality says form it. They form it, which under the MOU means they've got title to it. They take it to you, American Airlines, and American Airlines says, this is heavier than what we took off, and their own plant manager says, this was entirely our fault, and in his words, Asdell didn't do anything wrong on the weight, JA 839, and a host of other sites throughout the record, and what you have then is Zodiac doesn't fess up. They say, American Airlines apologized to us. It was their mistake, and that's at JA 1566-67. They say, you're warping, which they hadn't complained about before, is a disgrace, and to save face, you've got to come up with a lighter product, and what Zodiac does not do is cancel the contract. They don't cancel it under 11A or 11C of the MOU, and if you look at their forecast or JA 2255, the orders dealing with the heavier 2000 weight, which is precisely what they ordered, Zodiac accepted the first 144 sheets, and again, they inspected them. They formed sidewalls. They sent them to their client. That's $30,000 at JA 2258. We actually think we're entitled to partial summary judgment on that. We think they accepted them, but beyond that, if you look at paragraph 7, the forecasting, they make an agreement in the MOU. We know it takes you six months to do this. We know you've got to order everything. They've ordered 550 more for October, 550 more for November, 550 more for December. They've ordered 2,900, and what the contract says is they're due for them. They've got to pay for them unless certain situations are met, and they're not met. We are dealing with the jury question. Yes, sir. What about the potato chip curl problem? What, the potato chip curl problem? The curl. Wasn't that something that was throughout the course of... It is a jury question, we think. They never complained about it before. They did complain about it once it was too heavy, and our expert and others say, you know, this is thermoforming with heat. It'll come out. It'll be just fine, or it'll, you know, it's a jury question. It really is. That's not the reason that it was not accepted, or at least we think it was pretext. Talk about that email. I think it's maintained that was a termination, and how does that create a jury question? Which one? The email, the July 2nd email. Well, the July 2nd email, they do send an email, and it does have a mixed message in it. In fact, the next day, in fact, that very email says that American just doesn't understand that when you thermoform it, when you heat it, it's going to look just fine. It says we're still going to work with this product. It doesn't cancel the product. It doesn't cancel the MOU, and it doesn't say that anything is canceled under any term. Now, what does happen, on September the 17th, they send a purchase order zeroing out everything, and we have to deal with that, but the problem is, under paragraph 7, we get 60 days, and we're entitled to payment for everything along the way, and keep in mind, if we met our specs, their theory of the case seems to be we meet our specs, they botch the calculation, and somehow we suffer. We have to eat $600,000. That's not what the contract says. They're trying to write paragraph 7 out of the contract, and frankly, paragraphs 9 and 10 also, which talk about we warrant nothing except that we're going to meet the specs. I'd like to save the rest of my time. Thank you very much. Thank you, Mr. Alexander. May I please score? Sure. I'm Bevan Alexander, Robert Silverberg, Claire Shapiro. We represent C&D Zodiac, and Jim Evans represents the crane successor, NEHA. There are two central, uncontestable facts in this case from which all the rest of the answers to the legal questions flow. The first is that the AeroLite product failed, and the second is that American Airlines required C&D, as a result of this failure, to return to the CrushCore material previously being used, and that did, in fact, occur. And these are undisputable. Hanwha Asdel, whom I'm going to call Asdel here, claims that this document that we have is, and they've raised this for the first time on appeal, is a master agreement. That term was introduced on appeal. It is an MOU. There are specific provisions within the MOU that call for a subsequent permanent agreement, and those are the whereas clause D and E and paragraph number 6. What difference does it make that it's a contract? Well, they're characterizing it as a master agreement. Well, because the Memorandum of Understanding clearly is drafted by parties who have agreed, and I disagree with Mr. Freeman on this, we didn't just order the 2,000 grams per square meter GSM. The parties agreed to it. They worked on it. There's a recitation in paragraph 4.1, I believe it is, about how everybody's been working on developing this. The 2,000 GSM was selected because it was lighter than the 2,400 GSM that had been previously used, and these people knew when they set this Memorandum of Understanding, as opposed to a long-term permanent agreement that was contemplated. The MOU is not bound by a confidentiality agreement under the MOU? Under the MOU, yes, sir. There are confidentiality agreements. Would they be entitled to damages? If they could prove damages, if they could prove causation, or if they could prove a breach, yes, sir. But they can't, right. Well, in this contract, because it seems like to me there is an action here under this MOU if you did not comply with the terms of it. Is that right? Well, you misunderstand me. I've miscommunicated to you. If I've suggested that there is no contract, there is a contract under the MOU. It isn't a master agreement. The form of that contract was to try and get a product that had never been molded into airplane sidewalls, developed to go onto airplane sidewalls. Everybody thought it was going to work. They set out forecasts into the future, and lo and behold, when they get to molding this stuff, what they get, and I'm taking things a little out of order, what they get is a bunch of curved sheets that when curved sheets are molded, they become curved parts. Those curved parts couldn't work, and they were appropriately not accepted or rejected by an email in 2000. Rejected by whom? By C&D. When they brought these in as a fit check, American Airlines. They did not meet the specifications of C&D or of American? Well, both. And it's not that they didn't meet the specification of American. It's really the specification of C&D. Well, for the rejection or nonacceptance, the C&D is the party that's actually doing this rejection. But under 8.513, the parties in Virginia Code 8.2513, Standard Uniform Commercial Code provision with respect to acceptance, the parties can set out an acceptance provision. The parties in this MOU allocated the risk of all of this fitting and the capacity to sell it to the airlines. They allocated that risk in a specific paragraph in paragraph 11C. When did you tell the other side when it did not meet the specifications? When did that occur? July 2, 2008, in the email. Oh, the email. Yes, sir. The email is the basis for the termination, and you say that says this contract is terminated. We believe, Your Honor, that that is more than enough and that the regular conduct of all of this. Did it say that? Oh, not in those terms, no, sir. What did it say? What it said exactly. It didn't indicate termination. That would take it out of the province of a jury deciding otherwise. Well, if they had used those terms, Your Honor, it would clearly remove any material doubt of any kind in anybody's mind. But that is not what's necessary to make a genuine issue material fact. What it says is they definitely cannot be used for sidewall production, which was the central issue in the entire MOU. But isn't it determination of whether it meets the specifications? Specification isn't the sole test. The test is whether under 11C. It is, isn't it, under the MOU? No, sir. I thought the MOU said, and this is where I get confused. I'm just asking for help. I know. My job is done. The MOU, as I understood, says, and that thing was pretty limited, says we're going to do some business with you, but I tell you what, we're not going to warrant anything, and we're not even going to say they're intended for any specific purpose. But, you know, if it doesn't meet your specification, then, you know, then that's a rejection. It's a performance specification that says only so much as what it says. What happens in the MOU with respect to whether this is going to work for this purpose, I direct the court to the record 2190 on which page 11C1 appears. In 11C, if you look at the termination provisions, Your Honor, the number A is a very typical, you know, not a for-cause breach. D is a very typical not-for-cause breach. This is D, I mean, C is obviously tailored to this specific contract, and it lays out that the material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing. And it gives C&D, and then you look at 2, which is also, I submit, Your Honor, therefore part of what is the specification, what is the performance and what is the standard for acceptance under the Uniform Commercial Code is 2, and the customer requests that they switch back. And the reason why that works in this setting and the reason why it doesn't create any issue of fact is that this was a contract whose central purpose was to develop these sidewalls for four projects, only one of which was actually in play, which is the American Airlines 757 project. And the American Airlines said, We can't use this stuff, go back to Crush Core. Then the entire... They didn't say go back to Crush Core. They simply said, We can't use this product. And then it was your client that then said, Well, we'll give you Crush Core. Well, Crush Core was what had always been used. I understand that, but I want to make sure we... That's a very important point there, and you know it is, because that kicks in that second problem there. But they didn't say go back to the original one. American didn't. I just want to get that point. Your Honor, that interpretation... That threw me off. The switchback, the reason why I said that, switchback is the term in C... But American didn't use that. No, sir. And switchback obviously is written with the positive perspective that they had gotten some of these things, it had gone in, it had been tried, and we say, You know, we're not real happy with this stuff anymore, we're going to go back. I'm not agreeing with all that, but I just want to make sure that it's clear that the client, American, was not the one that said it. They did not tell... That came from your client, says, Okay. Because I assume from American's response, they wanted a product that would work. They probably wanted something that was going to be better. And you said, Well, I will just give you Crush Core. Well, it was my understanding of the record, and I don't remember exactly what page is it, but I think that it was clear that there was... that Asdell was present at the FIT check. That FIT check is when American Airlines was there, and they said no. So the chronology of these events... I'm not disagreeing on that. I think we're agreeing on the fact that American didn't specifically say go back to the original. That's the only question I'm saying. And I'm saying to the Court that this continue with or go back is immaterial with respect to either the acceptance or with respect to the termination. I mean... There's a provision in here that says if the client says go back to the original, that is a basis for termination. Yes, sir. That's the point I'm saying is that you don't have that one. I believe we do have that one, Your Honor. I believe that that... And Judge Moon found that that communication was sufficient. I understand here, so maybe you can go on, but I think it says that if you're going to get that one, the client has to request it, and I think we all can agree the client did not request it. It is what happened as a result of the client not taking that other product, but they didn't say go back to it. In January of 2008... I just want to know that answer. I'm not trying to confuse you. You'll get a chance to explain, but they did not... There's no document that I'm aware of that's been provided by American Airlines that was a direction, stop using Aerolite because they never started using it, and go back to Crush Core. The first part I don't need. It would have been the second part. Go back, of course, but that's the only part I'm saying is not there. Stop using is fine. In January of 2008, and it's in the 1,100-place area of the record, there is a letter from American Airlines to C&D that says we're okay with you trying this Aerolite stuff as long as you keep enough Crush Core available to continue to do. In July of 2008, after this had occurred, the American Airlines gave a... We sent American... C&D sent American Airlines a purchase order to use the Aerolite material, and they never accepted it. And the contract that they had with American Airlines continued with the construction of the Crush Core. So we submit, Your Honor, that the events that occurred between the fit check on July 28 and the communication on... Excuse me, June 28 and the communication by email on July 2 made it clear to all the parties, including ASDEL, that this material that was the subject of the MOU was not going to be used for the sidewalls. And because it wasn't going to be used by the sidewalls and American Airlines wasn't going to allow that, it was gone out of the project, and I think everybody knew that. Yes, ma'am. I'm wondering why you're belaboring that point. It seems to me that your brief was standing on 11-1, wasn't it? Well, it fits on... Yes, sir. Well, there's so many places to come down on it. I think 11-1... I'm confused. Which is your strong point? Both. Both. They're both. Either one of them are fatal. They both occur, they're both fatal, and that's part of the reason why I think Judge Moon, in reviewing this entire record, came to the conclusion there was no genuine issue of material fact, because in any direction you go, there is a termination, a valid termination of this agreement, either by failure to accept or by the terms of... the specific terms of 11-C-1. And while Judge Wynn has been asking me about how we get through 11-2, I think there's no question 11-C-1 also works very well. Let me take a little bit... Sir. You mentioned a term that was, to me, very important in cases like this, because it seemed to me, I see two companies in good faith trying to make things work and make products better, not intended for lawyers to be here in court, but we're here because that's the best thing we have. They don't make money with us here. Right. But you said allocation of risk, and that's really a good term, because that's what Member Randall's understanding are. They had a product, Aerolite, that they thought was going to work, and you thought it might work too, and you want to introduce this to America, and say, you know what, I'll take a chance, but I want, as you said, this in reserve, what we normally use, but take a hand in it. But tell me, what was the risk that was allocated to your client? You're ordering $5.50, $5.50, $5.50. Is it all to them what is rejected? That, okay, thank you very much, nobody wants that product, we don't give you a thing. What was allocated to your client in light of everything you said? In good faith, Americans said we don't want it. What's your allocation? Once they did the fit check. And the fit check passed. Remember that all of those allocation reports that are signed by ASDL as well have a 40 pre-production set. If we get through the 40 pre-production, that's all we're going to give you for pre-production, you do pre-production, if you accept it at that point, then you're going to be bound for the rest of those. That's the risk allocation to them. They get to test the first 40. If they say yes to this, then they're going to have to be bound to all of the next six months' worth of production. And that risk, there was a risk allocation, but in the methodology of creating the risk analysis, they allocate the risk of this stuff is going to be moldable to ASDL, and they accepted that we'll take it in six-month bites after that. What's the risk to your client, though, allocated to your client? Well, because it was a raw material, Your Honor, and the raw material was all that they were doing. The molding requirement for us had to come down at some point. That material had to be tested for its suitability, and that risk has to always be allocated to the material supplier. You gave them the wrong weight. No, sir, they agreed to that weight. They agreed to that weight. The parties agreed to that weight. That's a disputed fact. I believe that they take one stray comment from a plant manager who had nothing to do with the decision to pick that weight as a foundation for trying to make it look like there's a dispute. The parties, when you look at the MOU, clearly picked 2,000 GSM. They've been working on it for a long period of time. Let me speak really briefly. I've got almost no time left. I want to speak briefly about the confidentiality. We just submit that the confidentiality is not met. The specification clearly isn't a part of the NDA at all. The MOU calls it out, as Judge Moon points out. When you look at paragraphs 1, 2.1, 2.2, 2.10, it's plainly not part of it. The molding, I submit, you have to look at 1023 through 1036, which is the test report that was done contemporaneously, and it refers to 1350 in all of those. This is in 2010. It's a contemporaneous test report. It clearly is after CAB has been developed. Bruce Andrews at 2452 makes it clear that this material or failure of the Explain this in the context of the MOU where it looks like ASTEL says we don't warrant this product. We're not saying it's going to be for any particular use. It looks like it's pretty broad in what they're saying. Basically, they have to meet the specification. I think it's modified by the specific language in 11C1. That creates what, a warranty? Well, a specific fitness for as predicted. Why would it say we don't warrant anything? There's a very specific statement in there that says, no, we're not telling you that this product is going to be used for its intended use and all that other stuff. It just says it will meet your specification, which makes sense. You give them a product, and then you test and do to see if it fits. But they don't know what you're going to test and fit. They know. They did know. But basically, they said, we're not going to warrant. I read it as, we're not going to say this thing works on aircraft carriers. I know what you meant. I'm a Navy guy. That's right. I know you can't get it out of your system. Airplanes or wherever. They're just saying, you know, here we get this product. It will meet your specifications. That's it. I don't think that's what the terms of that agreement was. I've gone way over my time, Your Honor. Judge Grisham allows us to speak a little longer if we need to. If Judge Wynn has further questions, you have more time. If you've answered that question, I'm on my way. I am here at your pleasure. Thank you very much. Thank you, sir. Thank you very much, Mr. Alexander. Mr. Evans. That's rare for counsel to come from the audience. It was awfully crowded up here, Your Honor. That's very nice of you, too. I hope you don't mind. Close you out. You're the youngest one up there, right? Good morning, and may it please the court. My name is Jim Evans. I'm here on behalf of NENA Technical Materials. NENA owns a subsidiary of Crane that was at issue, which was a third-party non-party to the litigation below. In my very brief time here this morning, I'd like to explain why it is that Asdale cannot and has not shown that Crane properly withheld from its production 30 privileged documents pursuant to the common interest doctrine. In Asdale's opening brief, I believe in error, it neglected to mention that the district court actually wrote an opinion on this. That opinion is available in the joint appendix at page 1254 to 1258. That opinion by the district court is thorough. It's well-reasoned. It's amply supported by case law of this court, including NRA grand jury subpoena, which is a 1990 case, and the Hunton and Williams case, which is a 2010 case. As was the case before the district court, Asdale does not argue that there was no common interest between Crane and SABIC, but rather argues that Crane should have been required to provide details of a joint legal strategy. As the district court explained in its opinion, there is simply no such requirement in the law for a party asserting the common interest doctrine to make such a showing. I can say a bit more about the documents if you'd like. The documents at issue are 30 otherwise privileged communications between Crane and SABIC, which is another third party, another non-party to the litigation. These communications were exchanged in response to a letter from Asdale to SABIC in which Asdale threatened litigation against SABIC and implicated the legal interests of both Crane and SABIC. SABIC and Crane thereafter entered into a joint defense agreement, and in fact, the challenge documents include the memorialization of that agreement. Of course, under the Fourth Circuit law, memorialization is not required. The chronology was fully and very clearly explained by counsel for Crane at the time that it asserted the joint defense and common interest privilege, and both the magistrate judge and the district court concluded that the documents were properly withheld. There's no abusive discretion here. And for those reasons, Your Honor, it's my client's belief that this is a frivolous appeal and asks for the foregoing reasons as well as the reasons in the joint brief that the court affirm the district court's decision. I thought you'd get her ass with sanctions or something. I don't know what that statement is going to be. Okay. Thank you, Mr. Evans. Thank you. All right. Mr. Friedman, you have time reserved. Thank you very much. I want to start by hitting a couple of real big things, and then I want to get to risk allocation, which is the most important thing we have to talk about for rebuttal purposes. I want to point the court out to JA954, which is something from Zodiac to us dated September, the end of September, where they're sending us something per the MOU, long after that July 2nd email came. They're dealing with that MOU long after that. At 7-16, they're thinking maybe we can sell this to a Continental. Maybe we can put some heavy ones on with some light ones to even it out. Maybe we can use it for seats. The end of July 2nd email was not a termination. It was not a termination. Or at the very least as a jury question. At the very least it's a jury question, yes, sir. The pre-production. Pre-production never appears in the MOU. In fact, one of their witnesses agreed to that at JA542. It's something that suddenly showed up in one of their purchase orders. And the problem with that is the MOU has an integration clause at paragraph 14, and it says contrary purchase order terms are void. So that's really not a valid argument either. And I could go into more detail, but I'm running out of time, so I'm going to skip to the risk of allocation, which is really important. And I'm going to start by pointing the court to JA2564, which is yet another, because there are a lot of them in here, emails within Zodiac. In this one, Mr. Martin says, I imagine that they, and it's Asdel, are really putting over the $350,000 or $400,000. That's how much we're out, risk of allocation-wise, because they do know that it was our mistake to order the 2,000 GSM. The person who receives this email understands what's being said. So let's look at this paragraph 11 and see what it really means. Can we meet the spec? And I repeat what I said earlier. They're trying to write 11C. I'm going to go through, if I can, all of it, because it all matters. They say that there's a big difference between termination and cancellation. And there is. 11A says you can cancel this MOU without liability for breach. If there's a breach, they can say you breached and walk. They didn't invoke that. 11C says you can terminate this MOU as well as any open orders if it doesn't perform as predicted and is deemed not suitable and you've given 60 days' notice, blah, blah, blah, which didn't happen, for one thing. But B, it doesn't say without liability. It's subject to the forecasting. And that's what D says. D says that if this thing is terminated by C&D, and remember, termination isn't for breach. We didn't breach. Termination is this didn't work out. We gave them specs that work, but they botched something or American goes bankrupt or is hit by, you know, an explosion. Then, under D, you have a situation where if they can prove it's not because of their fault totally without their control and subject to acceptance by ASDEL, then maybe they can get out from under it. But the way it is, it was their fault and they admitted it. And they're subject to paragraph 7 and 9, the forecasting, and they're just trying to write it out of the contract. I'm happy to answer any other questions. So you're saying the curling was their fault? I'm saying that even they recognized that the curling was not the deal breaker. In fact, in that July 2 letter that they rely on so heavily, at JA 884, even the author says that our product would retain, this is a quote, would retain desired shape and appearance upon installation. It gets heated. Now, they say in some of the testimony that they feel lucky because they botched it, but they can use this as an excuse. But they didn't use it as an excuse. They formed it until they found out that it was way too heavy. And we say it's a pretext as a minimum. We shouldn't have had summary judgment granted against us, sir. All right. Thank you very much. Thank you very much.
judges: Roger L. Gregory, Barbara Milano Keenan, James A. Wynn, Jr.